***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer.
3. The carriers liable on the risk are correctly named above.
4. Plaintiff's average weekly wage at all relevant times was $210.00.
5. Plaintiff sustained an injury on or about 31 January 1998.
6. The injury with Pinewood Forest Assisted Living arose out of and in the course of employment and is compensable.
 ***********
Based upon the competent and credible evidence, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 39 years old. She has a GED, and received her certification as a nursing assistant in 1996.
2. Plaintiff became employed by defendant-employer Pinewood Forest Assisted Living, in June 1996. Discovery Insurance Company was Pinewood Forest's workers' compensation carrier. Plaintiff's job duties as a Certified Nursing Assistant included distributing medications, posting doctors' orders, supervising other personnel, and providing personal care for the residents, which included, among other things, aiding with tasks such as bathing, dressing eating, brushing teeth, and combing hair.
3. On 31 January 1998, plaintiff was changing a diaper on a resident who was confined to a geriatric chair when the resident reached behind plaintiff, grabbed the hospital bed, and pulled both of them backwards into the bed. Plaintiff struck her lower back as both she and the resident slid down onto the floor. Plaintiff called for assistance but received no response. Eventually, plaintiff was able to get the resident back into the geriatric chair. Plaintiff reported the injury to her supervisor and filled out a written accident report. She continued to work for the remainder of her shift, performing primarily desk work.
4. On 2 February 1998, plaintiff's supervisor sent her to receive medical treatment for her back. Plaintiff presented to Dr. Aaron R. Cotton at Lenoir Memorial Hospital. X-rays were performed and plaintiff was diagnosed with acute lumbar strain and mild scoliosis, and was instructed to remain out of work for two days.
5. On 5 February 1998, plaintiff presented to Doctors Urgent Care Center with persistent back pain. Plaintiff was kept out of work and referred to orthopedic surgeon Dr. Charles Classen at Kinston Orthopaedics and Sports Medicine Center. Plaintiff first treated with Dr. Classen in 1983 for shoulder problems. Other physicians at Kinston Orthopaedics and Sports Medicine Center treated plaintiff for chronic thoracolumbar strain in 1986, 1993, and 1994, at which time plaintiff was diagnosed with a low back strain with left midline paresthesia and degenerative changes at the L1-2 disk.
6. Plaintiff presented to Dr. Classen on 10 February 1998. Plaintiff's symptoms at that time included pain in her back that was radiating into her left buttock. Dr. Classen reviewed x-rays and diagnosed plaintiff with an acute lumbosacral strain. He recommended physical therapy and initially restricted plaintiff to sedentary work. After missing one or two days of work, plaintiff returned to work at light duty, cleaning ovens and doing dishes.
7. An MRI was performed on 18 February 1998 in order to rule out the possibility of a herniated disc. Following a review of the MRI results on 23 February 1998, Dr. Classen gave plaintiff restrictions of no lifting greater than 40 pounds, no climbing, no squatting, no bending, no turning and no twisting.
8. Plaintiff returned to Dr. Classen on 5 March 1998, with continuing complaints of lower back pain. An examination revealed that plaintiff's pain was not radiating into her extremities and was not associated with weakness or numbness. Dr. Classen noted that plaintiff's complaints of severe pain arose at different times during the exam, "but with no consistent pattern." Her neurologic and functional evaluations were normal. Dr. Classen maintained plaintiff's restrictions, and scheduled plaintiff for a follow-up on 10 March 1998. Subsequent to the follow-up examination, Dr. Classen was still unable to correlate plaintiff's complaints of pain with the results of her physical examination, so he referred plaintiff to orthopedic surgeon Dr. Scot E. Reeg of the Eastern Orthopaedic Group.
9. Plaintiff was first seen by Dr. Reeg on 2 April 1998. Dr. Reeg examined plaintiff's x-rays and MRI. His physical examination of plaintiff revealed a loss of range of motion in the lumbar spine, but otherwise found no obvious neurological abnormalities. Dr. Reeg diagnosed plaintiff with a myofacial strain of the lower back with no profound structural abnormalities identified. He recommended work hardening and physical therapy, and instructed plaintiff to continue performing light duty work under the restrictions imposed by Dr. Classen.
10. Plaintiff underwent her initial physical therapy evaluation on 7 April 1998. At that time, plaintiff was experiencing pain down the front of both of her legs, and into her hips with numbness in her toes.
11. On 5 May 1998, plaintiff reported to Dr. Reeg that physical therapy seemed to aggravate her symptoms. Dr. Reeg stated that plaintiff had reached maximum medical improvement and instructed plaintiff to continue taking anti-inflammatory medications as needed. Dr. Reeg did not give plaintiff any permanent partial disability rating, nor did he impose any permanent work restrictions.
12. Plaintiff ended her employment with defendant-employer on 8 May 1998. Plaintiff's notice of resignation states: "I got a better job offer with benefits and more money. I loved working with the residents and Mrs. Smith, but I could not refuse this job."
13. Plaintiff began working at National Spinning as a doffer after leaving defendant-employer. Plaintiff's job duties at National Spinning involved removing spools of thread from machines and replacing them with empty spools. The new job did not require plaintiff to lift anything more than two or three pounds.
14. Despite changing jobs, plaintiff continued to have pain in her back and swelling in her legs. On 7 July 1998, plaintiff was terminated from National Spinning after having missed three consecutive days of work without notification. Plaintiff's absences were not related to her 31 January 1998 back injury, but were due to an unrelated illness.
15. Plaintiff next worked at Beulaville Garment as a sewing machine operator. Central Mutual Insurance was Beulaville Garment's workers' compensation carrier. Plaintiff sewed collars, and was required at times to lift bundles of completed work which weighed between 25 and 40 pounds. Plaintiff testified that because there was no bending and lifting at the same time as there was with Pinewood Forest Assisted Living, the job at Beulaville Garment was less strenuous.
16. Plaintiff returned to Dr. Reeg on 20 August 1998, due to continued pain in her lower back. Dr. Reeg was unable to make a histologic or tissue diagnosis as to why plaintiff was suffering with the severity of symptoms which she described. He instructed plaintiff to modify her activities and continue taking her medication.
17. Plaintiff returned to Dr. Reeg on 29 September 1998, experiencing intermittent numbness in her legs in addition to her continued back pain. Dr. Reeg was still unable to explain plaintiff's symptoms, and he opined that she may have "something consistent with myofacial discomfort or fibromyalgia." He gave plaintiff a prescription for a new lumbosacral corset and instructed her to return to his office as needed.
18. On 10 November 1998, plaintiff's employment with Beulaville Garment ended when the plant closed. While working at Beulaville Garment, plaintiff continued to experience back pain; however, plaintiff did not suffer any additional injury to her back while employed with Beulaville Garment.
19. Plaintiff returned to Dr. Reeg on 5 January 1999, due to continued back pain. Dr. Reeg's opinion at that time was that plaintiff's symptoms were related to the soft tissues around the back and buttock region, representing a condition such as fibromyalgia. Dr. Reeg released plaintiff from his care on this date.
20. Plaintiff received a letter dated 2 February 1999 from Cassie Stallings, the adjuster from defendant-carrier Discovery Insurance Company who handled her claim. The letter stated that defendant-carrier would not authorize any further treatment for the injury plaintiff sustained on 31 January 1998; however, all medical bills from Dr. Classen and Dr. Reeg up to that point had been paid.
21. Plaintiff continued to suffer from back pain following her release from Dr. Reeg. Following defendant-carrier's refusal to authorize further medical treatment, plaintiff contacted Vocational Rehabilitation in an effort to obtain additional medical treatment. Vocational Rehabilitation referred plaintiff to orthopedic surgeon Dr. Paul Suh at the North Carolina Spine Center.
22. Plaintiff did not contact defendant-carrier regarding the referral to Dr. Suh. Plaintiff's failure to notify defendant-carrier was reasonable due to her belief that her workers' compensation claim had ended following the letter she received from Cassie Stallings.
23. Plaintiff presented to Dr. Suh on 29 March 1999. At that time, plaintiff was suffering from lower back pain and bilateral leg pain. Dr. Suh reviewed the MRI that was performed on 18 February 1998, and was of the opinion that plaintiff had a disc desiccation at L4-L5. Dr. Suh diagnosed plaintiff with degenerative disc disease and recommended physical therapy. In addition, Dr. Suh noted that plaintiff was "limited to 30 minutes of walking, sitting 15 minutes, standing 30 minutes, she is unable to lift."
24. During her physical therapy, plaintiff complained of left lower extremity weakness in addition to back pain. Plaintiff's condition failed to improve despite her participation in physical therapy.
25. Plaintiff was involved in an automobile accident on 22 July 1999. Plaintiff received treatment in the Emergency Room at Lenoir Memorial Hospital as well as with her family physician, Dr. Atilla, for complaints of lower back pain radiating into her legs, swelling of her feet, and headaches. The evidence is insufficient to show that the auto accident is responsible for plaintiff's present condition.
26. Plaintiff returned to Dr. Suh on 16 August 1999. At that time, plaintiff was complaining of left leg pain, and stated that she had diminished sensation of the entire left leg. Dr. Suh scheduled plaintiff to undergo a lumbar myelogram, post myelogram CT scan, a lumbar discogram and a post discogram CT scan. These diagnostic studies were performed on 9 November 1999.
27. Based on the results of the various diagnostic studies performed, Dr. Suh isolated the production of plaintiff's pain to the L3-4 and L4-5 levels of her spine. Dr. Suh recommended that plaintiff consider a two-level decompression stabilization and fusion at these levels. On 24 March 2000, plaintiff underwent an L3-L4, L4-L5 bilateral interlaminar decompression; L3-4, L4-5 posterolateral fusion; Miami-Moss instrumentation bilateral L3, 4 and 5; and a Harvest bone graft, performed by Dr. Suh.
28. Plaintiff has continued to treat with Dr. Suh. Plaintiff's pre-operative pain diminished initially; however, plaintiff again began experiencing back pain and weakness in both legs on or about 17 January 2001. Dr. Suh opined that plaintiff's current disabling condition was caused, in part, by her work-related injury of 31 January 1998. As a result of plaintiff's 31 January 1998 injury by accident arising out of and in the course of her employment she has been incapable of working and earning wages since 29 March 1999, the date she was first treated by Dr. Suh.
29. Plaintiff has also received medical treatment with Dr. Virginia Pact at Chapel Hill Neurology for pain management and treatment of depression. Since the hearing before the Deputy Commissioner, Dr. Pact has relocated to France, and another physician will be taking over her caseload. Plaintiff's treatment with Dr. Pact and her successor is related to her work-related injury of 31 January 1998.
30. Plaintiff attempted to further her education by attending classes at Lenoir Community College after her employment with Beulaville Garment ended; however, she was unable to complete any degree due to her continuing pain and the resulting inability to attend classes.
31. Based on the greater weight of the evidence, plaintiff did not sustain a new injury or materially aggravate her original compensable injury of 31 January 1998, while employed at Beulaville Garment. Defendants Beulaville Garment and its insurance carrier, Central Insurance Companies, should be dismissed from this action.
32. Plaintiff's average weekly wage as of 31 January 1998 was $210.00, yielding a compensation rate of $140.00.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. As a result of her compensable injury by accident on 31 January 1998, while working for defendant-employer, Pinewood Forest Assisted Living, plaintiff materially aggravated her pre-existing condition of degenerative disc disease. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff, as a result of her compensable injury of 31 January 1998 and her worsened condition, has been totally disabled from work since 29 March 1999, the date she was initially diagnosed by Dr. Suh and he noted specific limitations in plaintiff's ability to function. Accordingly, plaintiff is eligible for temporary total disability compensation in the weekly amount of $140.00 beginning on 29 March 1999 and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
3. Dr. Suh's continuing treatment of plaintiff, including the 24 March 2000 surgery, was reasonably necessary to effect a cure, give relief, and lessen plaintiff's period of disability and is hereby approved. In addition, the treatment offered to plaintiff by Dr. Pact and the successor to her practice is reasonably necessary to effect a cure, give relief, and lessen plaintiff's period of disability and is hereby approved. Plaintiff's failure to seek authorization from defendants to change her treating physician is justified in light of defendants' notice to plaintiff that they were denying further medical treatment. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendant-employer, Beulaville Garment and its insurance carrier, Central Insurance Companies, are dismissed from this case and are not responsible for any workers' compensation benefits to be paid to plaintiff as a result of her compensable injury by accident of 31 January 1998.
2. Dr. Suh is approved as plaintiff's treating physician and Pinewood Forest Assisted Living and Discovery Insurance Company are responsible for the costs of surgery performed by Dr. Suh and for future treatment provided or recommended by Dr. Suh and/or Dr. Pact or her successor.
3. Defendants Pinewood Forest Assisted Living and Discovery Insurance Company shall pay to plaintiff temporary total disability benefits in the amount of $140.00 per week beginning 29 March 1999, and continuing until further order of the Commission. Defendants shall receive credit for any unemployment benefits received by plaintiff pursuant to N.C. Gen. Stat. § 97-42.1. The amount which has accrued shall be paid to plaintiff in a lump sum, subject to the attorney's fee approved below.
4. After defendants receive credit for the unemployment benefits stated above, that amount which has accrued shall be paid to plaintiff in a lump sum, less 25% which shall be deducted and paid directly to plaintiff's attorney. Of the continuing amount, defendants shall pay every fourth compensation check to plaintiff's attorney.
5. Defendants shall pay the costs, which include an expert witness fee of $325.00 to Dr. Charles Classen and $500.00 to Dr. Paul Suh.
This the ___ day of December, 2002.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN